The Memorandum Decision below is hereby signed.

Dated: March 17, 2008.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re | ) |
| | ) |
| DEBRA M. STEVENSON, | ) Case No. 06-00306 |
| | ) (Chapter 13) |
| Debtor. | ) |
| _____ | ) |
| | ) |
| FIRST AMERICAN TITLE | ) |
| INSURANCE COMPANY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Adversary Proceeding No. |
| v. | ) 07-10005 |
| | ) **Not for Publication in** |
| DEBRA M. STEVENSON and | ) **West's Bankruptcy Reporter** |
| EUGENE SMITH, | ) |
| | ) |
| Defendants. | ) |

<u>MEMORANDUM DECISION RE CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

The plaintiff, First American Title Insurance Company,
commenced this action by the filing of a two-count complaint
against the debtor, Debra M. Stevenson, and her son, Eugene
Smith.  At issue is a loan that was extended by Fremont
Investment & Loan ("Fremont") to Stevenson in order to refinance
a pre-existing loan secured by real property owned by Smith and
Stevenson as joint tenants (the "Fremont Refinance").  The

plaintiff was Fremont's title insurer in the transaction.[1]

The first count of the complaint seeks (1) a declaration that Smith is obligated on the loan, and (2) reformation of the Fremont deed of trust to include Smith's signature.  The second count seeks to have Fremont (or more accurately, Fremont's successor in interest) equitably subrogated to the lien position previously held by Wells Fargo, whose loan was satisfied through the Fremont Refinance and whose related security interest had encumbered both Stevenson's and Smith's interest in the property.[2]

The parties have filed cross-motions for summary judgment, and on January 29, 2008, the court held a hearing to address those motions.[3]  For reasons explained in more detail below, the

---

[1]  In arguing that the equities weigh in their favor, the defendants contend that Fremont and its successors in interest have adequate recourse against First American and or PSS, "who should rightfully be held responsible for its reckless behavior and attempts to cover it up."  Defs' MFSJ at 10.  That other remedies are available is not, alone, a basis for denying the requested relief.

[2]  In addition to being the prior lienholder whose loan was satisfied through the Fremont Refinance, Wells Fargo also happens to be Fremont's successor in interest.  To avoid confusion, the court will refer specifically to Wells Fargo only when addressing the loan that was satisfied through the Fremont Refinance.  When referring to the Fremont loan and deed of trust, the court will refer generally to Fremont or Fremont's "successor in interest" without specifically naming Wells Fargo.

[3]  Whereas the defendants' motion seeks summary judgment on both counts of the complaint, the plaintiff has only requested summary judgment with respect to its claim for equitable subrogation.

2

court finds that Fremont's successor in interest is entitled to
equitable subrogation, unless the court later determines that the
lien is altogether void based upon Fremont's alleged violation of
various federal and state lending laws.  Accordingly, the court
will grant partial summary judgment in favor of the plaintiff's
as to count II of the complaint, reserving for later disposition
the defenses asserted by the defendants as to the validity of
Fremont's lien.  The court will grant summary judgment in favor
of the defendants as to Count I of the complaint.

I

The following material facts are not subject to any genuine
dispute.  Stevenson and Smith own the subject property, 3721
Grant Place, NE, Washington, D.C., as joint tenants.  On August
20, 1996, Home Corporation deeded the property to Stevenson and
Smith as joint tenants.  On that same date, Stevenson executed a
promissory note in favor of Crestar in the amount of $76,300.
Although Smith was not a borrower on the Crestar loan, both Smith
and Stevenson executed a purchase money deed of trust in favor of
Crestar.  On February 21, 2005, Stevenson refinanced the Crestar
note through Wells Fargo, and once again both Stevenson and Smith
executed a deed of trust in favor of the lender, Wells Fargo,
this time in the amount of $115,000.  On December 9, 2005,
Stevenson refinanced the Wells Fargo loan and executed a deed of
trust in favor of Fremont in the amount of $135,000.  The Fremont

3

loan was used to pay off the Wells Fargo loan in the amount of $118,129.03, and $204.99 of the Fremont loan proceeds were used to pay 2005 property taxes.[4]  Smith did not sign the deed of trust in favor of Fremont and the papers documenting the transaction do not purport to make Smith a co-borrower on the loan.

The deed of trust prepared in connection with the transaction provided a space only for the signature of Stevenson and not for Smith, and was signed only by Stevenson.  At the closing, Smith stated that he did not intend to transfer his interest in the property to Stevenson.[5]  Fremont nevertheless proceeded with the transaction, obtaining only Stevenson's name

---

[4]  It appears that $1,121.00 in funds were also disbursed to pay a Verizon bill, although the defendants dispute the nature of the Verizon obligation and whether the disbursement ought to have been made.  Whether this disbursement was or should have been made is not relevant to the issues before the court.  If the court determines that Fremont is entitled to equitable subrogation, it will be "subrogated only to the extent that the funds disbursed [were] actually applied toward payment of the prior lien. . . . [because] there is no right of subrogation with respect to any excess funds."  RESTATEMENT (Third) of Property: Mortgages § 7.6 (1997).  Thus, Fremont may only be subrogated to the extent of the $118,129.03 paid Wells Fargo and the $204.99 in property taxes that upon non-payment would have been a charge under the Wells Fargo deed of trust.  Fremont has no claim to subrogation with respect to the remaining disbursements.

[5]  The plaintiff contends that, prior to closing, Fremont believed that Smith intended to transfer his interest in the property to Stevenson.  Although Smith disputes this fact, resolution of this issue is unnecessary given that the plaintiff, by way of the Hamlin Affidavit, concedes that Fremont was advised at the closing that Smith did not, in fact, intend to transfer his interest to Stevenson.

4

on the deed of trust, thereby subjecting only Stevenson's

interest in the property to Fremont's lien.[6]

II

Pursuant to Fed. R. Civ. P. 56 (as incorporated by Fed. R.

Bankr. P. 7056), summary judgment will be granted where "there is

no genuine issue as to any material fact and the . . . moving

party is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(c). The court must deny summary judgment where there is a

genuine issue as to any material fact. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 247 (1986). If the movant makes a

properly supported motion, the burden shifts to the opposing

party to demonstrate specific facts showing that there is a

genuine issue for trial. Id.

If the moving party does not bear the burden of proof at

trial on an issue, summary judgment may be granted if the moving

party shows "that there is an absence of evidence to support the

nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317,

325 (1986). If the movant alleges that the opposing party lacks

proof to establish requisite elements of its case, the movant

must show the absence of such facts. Id. The court must view

the opposing party's evidence in the light most favorable to the

---

[6] The parties agree that Smith was present at the outset of
the closing, but they dispute whether Smith remained present for
the entire closing or if he left before the transaction was
completed. This factual dispute is not material to the issues
before the court.

non-movant's position and draw inferences in favor of that party,

provided such inferences are justifiable or reasonable.

Matsushita Elec. Indus. Co., Inc. v. Zenith Radio Corp., 475 U.S.

574, 587-88 (1986).

III

THE DEFENDANTS ARE ENTITLED TO AN AWARD OF
SUMMARY JUDGMENT ON COUNT I OF THE COMPLAINT

The defendants have moved for summary judgment with respect

to count I of the complaint, which seeks a declaration that Smith

is obligated on the Fremont loan and reformation of the deed of

trust to include Smith's signature.  At trial, the plaintiff

would bear the burden of proof to demonstrate that Smith in fact

intended to be obligated on the loan and that it was the

understanding of both parties that Smith would sign and be a

party to the deed of trust.

A.

The plaintiff cannot show that Smith
intended to be obligated on the loan.

The plaintiff has failed to come forward with or point to

evidence that it could produce at trial sufficient to support a

finding that Smith intended to be obligated on the Fremont loan.

At best, the plaintiff can point to Smith's presence and review

of documents at the closing, but that alone is insufficient to

support the inference that Smith intended to be personally liable

on the Fremont loan.  Likewise, there is nothing in the loan

6

documents to suggest that anyone other than Stevenson was an intended obligor on the debt.  Smith, by contrast, has shown that he was not obligated on the loan that the Fremont loan was used to discharge, which supports the inference that Smith did not intend to be liable on the Fremont loan.  Because the plaintiff would be unable at trial to show that Smith was an intended obligor, the court will grant summary judgment in favor of the defendants and deny the plaintiff's request for a declaration that Smith is obligated on the Fremont loan.

B.
The plaintiff cannot show that Smith intended to be a party
to the deed of trust such that reformation is warranted.

Reformation is an equitable remedy that "is available where there is an error in reducing the agreement of the parties to a writing." Isaac v. First Nat. Bank of Md., 647 A.2d 1159, 1163 n.10 (D.C. 1994).  Reformation is only permitted "when the amended terms will carry out the earlier true, but incorrectly or imperfectly stated agreement . . . ." Unsinn v. Wilson, 285 F.2d 273, 276 (D.C. Cir. 1960).  In some jurisdictions, courts have allowed reformation in order to supply a missing signature. See Smith v. Royal Auto. Group, Inc., 675 So. 2d 144 (Fla. Dist. Ct. App. 1996); Lane v. Spriggs, 71 S.W.3d 286, 291 (Tenn. Ct. App. 2001) (failure to sign deed the result of mutual mistake that could be corrected through reformation); Ames v. Fallert, 657 P.2d 224, 226 (Or. Ct. App. 1983) (allowing reformation of deed

7

to supply missing signature, and quoting 66 Am. Jur.2d 580,
Reformation of Instruments § 56 for the proposition that "the
general rule is that 'where parties to a deed or mortgage fail to
sign it, . . . reformation may be decreed as against a person
with notice of the defect.'"). Even if reformation of this sort
is permissible in the District of Columbia, the plaintiff is not
entitled to such relief.

The only evidence the plaintiff can point to in support of
its claim that both parties intended Smith to be a party to the
deed of trust is Smith's presence at and review of documents at
the closing and an unsigned draft of the deed of trust that
includes a space for Smith's signature.[7] See Compl. ¶ 15, Exh. E.
The draft document at best supports a finding that Fremont, at
one point in time, expected Smith to be a signator on the deed of
trust. It does not speak to the issue of whether Smith shared
that intention. Likewise, Smith's presence and review of
documents at the closing is insufficient to support the inference
that Smith intended to sign the deed of trust. Accordingly, the
court finds that the plaintiff would be unable at trial to

---

[7] The Hamlin affidavit also indicates that Smith remained
at the settlement and watched Stevenson sign the papers. Even if
the plaintiff were entitled to rely on the Hamlin Affidavit as
evidence admissible in its favor, which it is not because the
affidavit is not based on personal knowledge, evidence that Smith
was present at the settlement and reviewed the loan documents
with Stevenson is not sufficient, as a matter of law, to support
a finding that Smith also intended to sign the deed of trust.

8

produce sufficient evidence to permit a finder of fact to conclude that the absence of Smith's signature on the deed of trust is attributable to a scrivner's error, mutual mistake, or an unintentional omission on the part of Smith.  Although the court finds credible the plaintiff's assertion that Fremont would not have deliberately consummated the transaction without preserving a lien equal to that held by Wells Fargo, and even if Fremont always understood this to mean that Smith would need to either transfer his interest to Stevenson or sign the deed of trust, the reasonable expectations of Fremont do not confer upon and are not, alone, sufficient to support a finding of intent on the part of Smith.  Because reformation of a deed of trust is only available if such reformation will modify the document to reflect the parties' true intent, and because the plaintiff lacks evidence to show Smith intended to be a party to the deed of trust, the court will grant summary judgment in favor of Smith and Stevenson and deny the plaintiff's request for reformation of

the deed of trust.[8]

IV

EQUITABLE SUBROGATION APPLIES

In Count II of the complaint, the plaintiff asks that Fremont's successor in interest be equitably subrogated to the position held by the prior lienholder - Wells Fargo - and likewise seeks the imposition of an equitable lien on Smith's interest in the property.  Both parties have asked for summary judgment on this count.

As explained in <u>Eastern Savings Bank v. Pappas</u>, 829 A.2d 953 (D.C. 2003), subrogation is:

---

[8]  In opposition to count I of the complaint, the defendants argue that the statute of frauds renders the Fremont deed of trust unenforceable against Smith.  If the court were to reform the deed of trust to include Smith's signature, however, the instrument that purports to be effective against Smith's interest in the property would be entirely reduced to writing and would not run afoul of the statute of frauds.  <u>See</u> <u>Lane v. Spriggs</u>, 71 S.W.3d 286 (Tenn. App. Ct. 2001); RESTATEMENT (SECOND)OF CONTRACTS § 156 (1981)(providing that "[i]f reformation of a writing is otherwise appropriate, it is not precluded by the fact that the contract is within the Statute of Frauds.").  Similar reasoning disposes of this argument to the extent it is asserted in opposition to the plaintiff's claim for subrogation.  Although the general rule is that agreements concerning real property must be in writing in order to be enforceable, <u>see</u> <u>Railan v. Katyal</u>, 766 A.2d 998, 1007 (D.C. 2001), "under the equitable doctrine of subrogation, one who loans money to pay off a mortgage is subrogated to the rights of the mortgagee, even in the absence of a written agreement . . . ."  <u>Bell v. Beanum</u>, 2004 WL 515605 *1 (Mich. Ct. App. March 16, 2004)(unpublished).  <u>See also</u> <u>Reisner v. Stoller</u>, 51 F. Supp. 2d 430, 453 (S.D.N.Y. 1999) ("The statute of frauds presents no bar to the recognition of an equitable lien upon real property because the lienor seeks to prevent unjust enrichment, not to enforce an oral conveyance of property.").  Therefore the defendants' statute of frauds argument must fail.

the substitution of one person to the position of
another, an obligee, whose claim he has satisfied . . .
.   The basic principles underlying subrogation are the
same as those in constructive trusts, prevention of
merger, and equitable liens, *i.e.*, restitution to
prevent forfeiture and unjust enrichment.

Id. at 957 (quoting G.E. Capital Mortgage Servs., Inc. v.

Levenson, 657 A.2d 1170 (Md. 1995) & Handbook on the Law of

Mortgages § 277, at 561 (2d ed. 1979)(Osborne)).   Subrogation is

applicable in the context of mortgage refinancing, and "the great

majority of case law holds that one who pays the mortgage of

another and takes a new mortgage as security will be subrogated

to the rights of the first mortgagee as against any intervening

lienholder."   Eastern Sav. Bank, 829 A.2d at 957 (quoting G.E.

Capital Mortgage Servs., Inc., 657 A.2d at 1175).

The leading authority on the doctrine of equitable

subrogation in the District of Columbia is Burgoon v. Lavezzo, 92

F.2d 726 (D.C. Cir. 1937),[9] a case involving a buyer who

---

[9]   As a preliminary matter, the court notes that "Burgoon
was decided one year before Erie R.R. Co. v. Tompkins, 304 U.S.
64, 58 S. Ct. 817, 82 L.E. 1188 (1938), and the [Burgoon] court
relied upon and applied the 'federal' common law rather than
District of Columbia precedent." Eastern Sav. Bank, 829 A.2d at
958 n.10.   Nevertheless, the District of Columbia Court of
Appeals has concluded that Burgoon remains binding precedent in
the District of Columbia, and this court will treat it
accordingly. Id. ("At the time Burgoon was decided, the United
States Court of Appeals for the District of Columbia was the
highest court of the District of Columbia, and its decisions
determined District of Columbia law.  We therefore conclude,
although the point may perhaps be debatable, that Burgoon is
binding upon us under the rule of M.A.P. v. Ryan, 285 A.2d 310
(D.C. 1971).").

purchased property under the mistaken belief that, in light of
the release of a second deed of trust in the amount of $1,554.79
incident to the sale, the property would remain subject only to a
first deed of trust in the amount of $4,145.21.  The purchaser
later learned of a pre-existing and duly recorded third deed of
trust in the amount of $10,300.  When the holder of the third
deed of trust sought to foreclose, the purchaser successfully
argued that he should be subrogated, as against the third
mortgage holder, to the priority rights of the second trust,
notwithstanding that the purchaser had constructive notice of the
third deed of trust at the time of the sale. <u>Id.</u>; <u>see also</u>
<u>Eastern Sav. Bank</u>, 829 A.2d at 957 (D.C. 2003) (discussing
<u>Burgoon</u>).

In so holding, the <u>Burgoon</u> court considered numerous state
and federal cases that addressed equitable subrogation under
analogous facts.  Notwithstanding a lack of consistency from one

court to the next,[10] the <u>Burgoon</u> court identified a general trend

for courts to either apply subrogation restrictively or

liberally.  After struggling with the question of whether to

adopt the restrictive or liberal approach, the <u>Burgoon</u> court

ultimately concluded that it was bound, under federal common law,

to adopt the the rule requiring liberal application of the

doctrine of subrogation.  <u>Burgoon</u>, 92 F.2d at 735 (the federal

cases "clearly reflect the rule requiring liberal application of

the doctrine of subrogation and we think they have so far

committed the Federal courts to the rule that we ought not refuse

---

[10]   Grouping factually similar cases together, the court's
analysis revealed that there was little consistency in the
application of the doctrine from jurisdiction to jurisdiction.
<u>Compare</u> <u>Stastny v. Pease</u>, 100 N.W. 482 (Iowa 1904)(equitable
subrogation should be denied where a purchaser who advances money
has constructive notice of an intervening interest), <u>with</u> <u>Shaffer
v. McCloskey</u>, 36 P. 196 (Cal. 1894)(rejecting same theory).
<u>Compare</u> <u>Goodyear v. Goodyear</u> , 33 N.W. 142 (Iowa 1887)(equitable
subrogation should be denied in cases in which a purchaser
advances money as a part of the purchase price to pay off a lien
on the theory that the purchaser is paying his own debt and
should be treated the same as one who buys property and assumes
the debt), <u>with</u> <u>Barnes v. Cady</u>, 232 F. 318 (6th Cir. 1916)
(expressly repudiating theory that a purchaser is in effect
paying his own debt when he advances money as a part of a
purchase price to pay off a lien).  <u>Compare</u> <u>Fidelity & Deposit
Co. v. Vance</u>, 245 P. 578 (Okla. 1926) (equitable subrogation
should be denied on the grounds that the junior lienholder who
benefitted from the senior lienholder's mistake has the right to
rise to a primary position, which right would be defeated by
allowing equitable subrogation), <u>with</u> <u>Williams v. Libby</u>, 105 A.
855 (Me. 1919) (rejecting this theory and explaining that "the
only 'rights' of the junior lienor that can be said to be
actually impaired are gambling 'rights' to profit by a
purchaser's mistake").

to follow the equitable path they have chosen.").[11]  The liberal
approach is anchored in the belief that subrogation should not be
denied based upon technicalities and should instead be permitted
if its application is supported by the equities.  See Merchants'
& M.T. Co. v. Robinson-Baxter, 191 F. 769, 772 (1st Cir. 1911),
quoted in Burgoon, 92 F.2d at 734) (holding that in "applying the
doctrine of subrogation, no attention should be paid to
technicalities which are not of an insuperable character, but the
broad equities should always be sought out so far as possible.").

In disposing of the parties' cross-motions for summary
judgment, a critical issue is whether application of the doctrine
of subrogation should be permitted when lenders such as Fremont
have actual notice of intervening interests.  Although Burgoon
held that subrogation is permissible when a lender has only
constructive notice, the question of how to treat actual notice
is an unresolved issue in the District of Columbia.
Notwithstanding that Burgoon is distinguishable on its facts, the
court's broader holding that equitable subrogation should be
liberally applied is relevant to this court's determination of
whether to extend the doctrine to lenders with actual and not

---

[11]  The defendants make much of the fact that, in dicta, the
Burgoon court expressed reluctance to adopt the liberal approach.
It is Burgoon's holding, and not dicta, however, that constitutes
binding precedent in the District of Columbia.

14

merely constructive notice of intervening interests.[12]

The court in Eastern Savings Bank summarized the elements of

a claim for equitable subrogation as follows:

> (1) Payment [was] made by the subrogee to protect his
> own interest.  (2) The subrogee [has] not . . . acted as
> a volunteer.  (3) The debt paid [was] one for which the
> subrogee was not primarily liable.  (4) The entire debt
> [has] been paid.  (5) Subrogation [would] not work any
> injustice to the rights of others.

Eastern Sav. Bank, 829 A.2d at 961 (quoting Caito v. United Cal.

Bank, 576 P.2d 466 (Cal. 1978), as a decision deemed to be

consistent with Burgoon).  As explained below, the court finds

that Fremont has satisfied each of these elements and, subject to

the court's disposition of various defenses raised by the

defendants, the plaintiff is entitled to summary judgment on the

equitable subrogation count of the complaint.

A.

The debt was paid at the request of Stevenson and
was not one for which Fremont was primarily liable.

The plaintiff has demonstrated and the court finds that the

_____

[12] The defendants argue that the holdings of Burgoon and
Eastern Savings Bank are not controlling because those cases
involved competing lienholders, whereas the instant case involves
a dispute between a refinancing lender and a joint tenant.  Smith
has an interest in the property that was encumbered at the time
of the Fremont Refinance, but is now held free and clear as a
result of the Fremont Refinance.  This shift in Smith's property
interest now stands to frustrate Fremont's ability to enforce the
lien it thought it had acquired.  The facts are sufficiently
analogous to a dispute involving intervening lienholders such
that the principles of equitable subrogation ought to apply with
equal force.

debt paid by Fremont was not one for which Fremont was primarily

liable.   There is no dispute that Fremont satisfied the Wells

Fargo loan at the request of Stevenson for purposes of

refinancing the Wells Fargo mortgage and that, absent such

request, Fremont had no connection to or obligation to pay the

Wells Fargo loan.   See RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 7.6

cmt. e (1997) ("A mortgage debtor may ask another person to

discharge the debt.   In some circumstances, the payor who does so

is warranted in receiving, by subrogation, the benefit and

priority of the mortgage paid.   The most common context for this

sort of subrogation is the 'refinancing' of a mortgage loan; that

is, the payment of a loan with the proceeds of another loan.").

B.

The entire debt owed to Wells Fargo was paid
through the Fremont Refinance and the lien securing
that obligation was thereby rendered unenforceable.

Likewise, when viewing the evidence in the light most

favorable to the defendants, the court finds that the entire debt

of Wells Fargo was paid through the Fremont Refinance, and

although the parties dispute whether the Wells Fargo deed of

trust was ever technically released, by paying the balance due

under the loan, the Fremont Refinance rendered any lien securing

the Wells Fargo obligation unenforceable against Smith and

Stevenson.   As such, the plaintiff has shown that Fremont "paid

the entire debt," as required for application of the doctrine of

16

equitable subrogation, and has likewise shown that the Fremont Refinance bestowed a benefit upon Smith (whose interest in the property ceased to be subject to an enforceable lien as a direct result of the Fremont Refinance).

C.

Smith and Stevenson will not be<br>prejudiced by equitable subrogation.

The doctrine of equitable subrogation does not apply if it will work an injustice on the rights of others.  Invoking this defense, the defendants contend that they would be prejudiced by the application of equitable subrogation "because they would essentially be forced into foreclosure on a predatory loan." Defs.' MFSJ at 10.  The court rejects this argument because it fails to assess how Smith or Stevenson's interests would be unfairly prejudiced by equitable subrogation in the event the loan is found to be valid.[13]

To determine whether Smith would be prejudiced by equitable subrogation, it is necessary to compare Smith's rights as they

---

[13] In their motion for summary judgment, the defendants raise the defense that the Fremont lien is invalid because Stevenson rescinded the transaction and Fremont violated various state and federal lending laws.  If the lien is declared invalid or it is determined that the transaction was rescinded, Fremont's successor in interest will no longer have a claim to any security interest in the property, much less one that arises through the mechanics of equitable subrogation.  However, there is currently pending a Motion to Strike (DE No. 52, filed November 7, 2007) that, if granted, would dispose of the defendants' challenges to the validity of the Fremont lien.

17

existed under the Wells Fargo deed of trust with Smith's rights today if the court were to subrogate Fremont's successor in interest to Wells Fargo's previously held lien position.  The court notes that Smith has not transferred his interest in the property to an innocent third party for consideration, pledged his interest as collateral for another loan, or taken any other action to alter his ownership interest in the property.  Thus, allowing subrogation would not weaken any position that Smith was induced to take as a result of the Fremont Refinance.  Smith's claim of prejudice is thus more properly understood as a desire to "take an advantage offered by an inadvertence or mistake" of Fremont.  Barnes v. Cady, 232 F. 318, 328 (6th Cir. 1916) (discussed at length in Burgoon).  Although Smith may prefer to maintain the status quo, he cannot complain if the windfall that was previously bestowed upon him incident to the refinancing is now revoked.  As explained in Burgoon, the only rights of Smith that would actually be impaired if Fremont's successor in interest were equitably subrogated to Wells Fargo's lien position are Smith's "gambling" rights to profit by Fremont's mistake.  Burgoon, 92 F.2d at 733.  Impairment of that nature does not constitute prejudice.

Stevenson will likewise not be prejudiced if Fremont's successor in interest is subrogated to Wells Fargo's prior lien position.  The rights of Fremont's successor in interest vis-à-

18

vis Stevenson will not be altered by subrogation; rather,

subrogation will simply enable Fremont's successor in interest to

more effectively exercise those rights.   Stevenson has not

identified any position that she was induced to take that would

be weakened as a result of subrogation, and the court therefore

rejects any suggestion that equitable subrogation would unfairly

prejudice Stevenson.[14]

D.

Fremont's actual knowledge of Smith's interest does not present
a bar to equitable subrogation and Fremont was not a volunteer.

Smith advised Fremont, prior to the refinance, that he had

not transferred and did not intend to transfer his interest in

the property to Stevenson.   Thus, the court must address whether,

in the District of Columbia, a refinancing mortgagee's failure to

encumber a joint tenant's interest notwithstanding the

mortgagee's _actual_ knowledge of that party's interest presents a

bar to equitable subrogation, subject to the limited defense that

the lender can show its actions were due to excusable neglect.

As explained in the case of Bank of America v. Presance Corp.,

160 P.3d 17 (Wash. 2007), when evaluating a refinancing lender's

---

[14]   It would not, of course, be enough for Stevenson to
argue that she defaulted on the loan precisely because she knew
that the Fremont deed of trust reached only her interest in the
property, making it less likely that the lender would foreclose.
Defaulting on a loan in reliance on a defect in a lender's
security interest and a corresponding hope that the lender will
be discouraged from foreclosing would not be innocent conduct
entitled to protection.

19

right to equitable subrogation, jurisdictions tend to approach

the lender's knowledge of an intervening interest in one of three

ways:

> Courts generally consider knowledge in one of three
> ways when applying equitable subrogation to a
> refinancing lender.  First, the *Restatement* approach
> that says actual or constructive knowledge of
> intervening interests is irrelevant; second, a minority
> approach that says a plaintiff with either actual or
> constructive knowledge cannot seek equitable
> subrogation; and third, a "majority" approach that says
> a plaintiff with *actual knowledge* cannot seek equitable
> subrogation while one with *constructive notice* can.

Id. at 21 (emphasis in original).[15]  It is this court's task to

determine which of these three approaches is most consistent with

the law in the District of Columbia.  The Burgoon court expressly

rejected the theory that constructive knowledge should bar

application of the doctrine.  Burgoon, 92 F.2d at 730.

Accordingly, the only question that remains is whether District

of Columbia courts would follow the majority or the Restatement

approach.[16]  For reasons explained in more detail below, I find

---

[15]  As a footnote to its characterization of the third
approach being the "majority" approach, the Presance court noted
that "[i]t is not clear whether a majority of jurisdictions still
require a plaintiff not have actual knowledge of intervening
interests.  Since the *Restatement's* publication in 1997, numerous
jurisdictions have adopted it."  Bank of America v. Presance, 160
P.3d 17 at 21 n.5.

[16]  The Eastern Savings Bank court acknowledged the conflict
between these competing views, but ultimately found it
unnecessary to decide whether to follow the Restatement or
majority approach because the lender at issue in that case had
only constructive, not actual, notice.  Eastern Sav. Bank, 829
A.2d at 959 n.11.

that District of Columbia courts, consistent with the liberal

rule adopted in <u>Burgoon</u>, would follow the Restatement approach to

determine whether Fremont's successor in interest is entitled to

subrogation notwithstanding actual knowledge of Smith's interest

in the property.  The pertinent Restatement provision is

RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES ("Restatement") § 7.6

(1997).[17]

E.

1.  The Restatement approach is consistent with the
    equitable objectives of the liberal approach adopted in
    <u>Burgoon</u>.

---

[17]  The Restatement § 7.6 provides:

(a) One who fully performs an obligation of another, secured
by a mortgage, becomes by subrogation the owner of the obligation
and the mortgage to the extent necessary to prevent unjust
enrichment.  Even though the performance would otherwise
discharge the obligation and the mortgage, they are preserved and
the mortgage retains its priority in the hands of the subrogee.

(b) by way of illustration, subrogation is appropriate to
prevent unjust enrichment if the person seeking subrogation
performs the obligation:

    (1) in order to protect his or her interest;
    (2) under a legal duty to do so;
    (3) on account of misrepresentation, mistake, duress,
       undue influence, deceit, or other similar
       imposition; or
    (4) upon a request from the obligor or the obligor's
       successor to do so, if the person performing was
       promised repayment and reasonably expected to
       receive a security interest in the real estate
       with the priority of the mortgage being
       discharged, and if subrogation will not materially
       prejudice the holders of intervening interests in
       the real estate.

The plaintiff admits, by way of an affidavit submitted in support of its motion for summary judgment (the "Hamlin Affidavit"), that Fremont knew that Smith had an interest in the property prior to closing on the loan and that Fremont knew that Smith did not intend to transfer that interest to Stevenson.[18]

Under the majority view, by proceeding with the transaction notwithstanding its actual knowledge of Smith's interest, Fremont (or, by extension, its successor in interest) is not entitled to equitable subrogation unless the plaintiff shows that Fremont's actions were due to excusable neglect.  See Eastern Sav. Bank, 829 A.2d at 959 (the majority view is that actual knowledge of an intervening interest impairs the lender's right to subrogation).[19]

Unlike the majority approach, the Restatement takes the view that actual knowledge is only relevant if it can be shown to rebut the presumption that the refinancing lender reasonably expected to take a lien of equal priority to the mortgage being

---

[18]  The court is mindful of the plaintiff's argument that Fremont's knowledge of Smith's interest should not be controlling because it was the expectation of the parties that Smith either transfer his interest to Stevenson or sign the deed of trust. The court has already disposed of this argument by finding that, while it may have been Fremont's understanding that Smith would either transfer his interest or sign the deed of trust, there is no evidence to support a finding that Smith intended to sign the deed of trust if he did not transfer his interest to Stevenson.

[19]  If the court were to follow this approach, a trial would be necessary to resolve the factual dispute of whether Fremont's conduct constitutes excusable neglect.

paid.  As explained in the comments to Restatement § 7.6:

> [m]any judicial opinions dealing with a mortgagee who
> pays a preexisting mortgage focus on whether the payor
> had notice of the intervening interest at the time of
> the payment.  Most of the cases disqualify the payor
> who has actual knowledge of the intervening interest,
> although they do not consider constructive notice from
> the public records to impair the payor's right of
> subrogation.  Under this Restatement, however,
> subrogation can be granted even if the payor had actual
> knowledge of the intervening interest; the payor's
> notice, actual or constructive, is not necessarily
> relevant.  The question in such cases is whether the
> payor reasonably expected to get security with a
> priority equal to the mortgage being paid.  Ordinarily
> lenders who provide refinancing desire and expect
> precisely that, even if they are aware of an
> intervening lien. . . . **A refinancing mortgagee should
> be found to lack such an expectation only where there
> is affirmative proof that the mortgagee intended to
> subordinate its mortgage to an intervening interest . .
> . .**

Restatement § 7.6 cmt. e (emphasis added).  The Restatement also

takes the position that "[t]he point of subrogation is to prevent

unjust enrichment of others . . . ," Restatement § 7.6 cmt. b.

See also Restatement § 7.6 cmt a ("Subrogation is an equitable

remedy designed to avoid a person's receiving an unearned

windfall at the expense of another.").  Thus, under the

Restatement approach, the court's inquiry focuses on the

prevention of unjust enrichment and is less concerned with

penalizing careless lenders who are otherwise entitled to

subrogation.

The Restatement also rejects the sometimes confusing theory

23

that refinancing lenders who proceed notwithstanding knowledge of an intervening interest act as volunteers,[20] and instead adopts the presumption that, consistent with modern lending practices, such a refinancing lender should be presumed to reasonably expect to enjoy a security interest of the same priority as the mortgage being paid unless there is affirmative proof to the contrary.[21]

Unlike the Restatement, the majority approach requires a lender to affirmatively justify its conduct once it is established that the lender had actual knowledge of an intervening interest that it now seeks to trump.  If that lender then fails to prove that its conduct constitutes excusable neglect, subrogation will be denied without further regard for the lender's reasonable expectations, the windfall enjoyed by the junior lienholder, and the lack of prejudice that would result.  The dispositive significance attributed to actual knowledge under the majority approach threatens, in some cases, to block the doctrine's application in circumstances where subrogation would otherwise be available to restore the equities.  The Restatement

---

[20]  "Prior case law has often indicated that one who pays as a 'volunteer' is not entitled to subrogation.  However, the meaning of the term 'volunteer' is highly variable and uncertain, and has engendered considerable confusion.  This Restatement does not adopt the 'volunteer' rule, but instead requires simply that the subrogee pay to protect some interest."  Restatement § 7.6 cmt. b.

[21]  At least one court has expressly characterized the Restatement approach as being the most liberal of the three approaches.  Lamb Excavation, Inc. v. Chase Manhattan Mortgage Corp., 95 P.3d 542, 545 (Ariz. Ct. App. 2004).

avoids this pitfall by limiting the relevance of actual knowledge to those situations in which other evidence rebuts the presumption that the lender reasonably expected to receive a lien of equal priority to the mortgage being paid.  On balance, if the objective is accomplishing equity and not preventing the application of subrogation based on technicalities, the Restatement approach appears better suited to the task.  See Bank of America v. Prestance Corp., 160 P.3d 17, 28 (Wash. 2007) (electing to follow the Restatement approach in the context of refinancing because "[e]quitable subrogation is a broad doctrine and should be followed whenever justice demands it and where there is no material prejudice to junior interest[s].  A liberal approach is in line with the doctrine's equitable rationale and is becoming the more accepted rule, in no small part because of the immense benefits it holds for homeowners.").

Moreover, by divorcing itself from the fiction that refinancing lenders act as "volunteers" when they mistakenly fail to preserve the same priority lien as the mortgage they pay off, the Restatement approach allows the court to focus its inquiry on the equities that are actually present in any given case.  The court in Eastern Savings Bank acknowledged agreement between Burgoon and the Restatement approach on this score.  Eastern Sav. Bank, 829 A.2d at 958-61.  Although Eastern Savings Bank did not reach the question of whether courts in the District of Columbia would follow the majority or the Restatement approach to address

25

lenders with actual knowledge of intervening interests, it
nevertheless relied upon the Restatement in concluding that the
refinancing lender seeking subrogation in that case did not act
as a volunteer.  Id. at 959.  As observed by the Eastern Savings
Bank court, Burgoon also expressly rejected, under analogous
facts, the proposition that a purchaser who advances money in a
property transaction acts as a volunteer:

> This theory that the purchaser is a volunteer is, we
> think, entitled to little weight.  The purchaser is
> advancing his money intending to get something for it,
> to wit, a title unencumbered by the lien to be
> discharged.  It is hardly in accord with reality to say
> that he pays officiously, as an intermeddler.

Burgoon, 92 F.2d at 732.  In this case, as was the case in
Burgoon and Eastern Savings Bank, it "is hardly in accord with
reality" to say that Fremont satisfied the Wells Fargo loan
"officiously" and acted as a volunteer when it failed to encumber
Smith's interest and thereby took a lien of lesser priority than
the mortgage that it paid.  The court concludes that the
objective of the liberal rule adopted in Burgoon of insuring that
the broad equities be sought as far as possible is best
accomplished under the Restatement approach.  Accordingly, this
court will follow the Restatement approach in determining whether
Fremont's successor in interest is entitled to equitable
subrogation notwithstanding its actual knowledge of Smith's
interest.

26

2.   Smith has failed to offer affirmative proof
sufficient to show that Fremont did not reasonably
expect to enjoy a lien of equal priority to that
enjoyed under the mortgage it paid.

Under the Restatement approach, Fremont's successor in interest is not entitled to subrogation if Smith can offer affirmative evidence to rebut the presumption that Fremont reasonably expected to enjoy a lien of equal priority to the mortgage being paid. The defendants have failed to point to any such evidence they could produce at trial.

First, evidence of Smith's statement at the closing that he did not intend to transfer his interest in the property to Stevenson is not, alone, sufficient to overcome the presumption. Smith's alleged statement goes to the continued existence of Smith's interest, but does not purport to place Fremont on notice of how Smith's stated interest in the property might affect Fremont's security interest. Had Smith, in addition to stating that he would not transfer his interest in the property to Stevenson, communicated to Fremont his opposition to the transaction and his unwillingness, as a joint owner, to be subjected to Fremont's security interest, Smith might be able to argue that Fremont was on notice that it would not enjoy the same lien position as was enjoyed by Wells Fargo. Such a showing might constitute "affirmative proof" that Fremont intended to subordinate its mortgage to Smith's interest (by not enjoying a priority against Smith equal to the priority Wells Fargo

27

enjoyed), the type of proof that is required to rebut the
presumption that Fremont "reasonably expected to get security
with a priority equal to the mortgage being paid." Restatment §
7.6 cmt. e.

In his declaration, <u>see</u> Exh. F, Defs' MFSJ, however, Smith
does not contend that his opposition and unwillingness to be
subjected to Fremont's security interest was communicated to the
lender at the closing. Instead, the declaration indicates that
conversations about Smith's opposition to the loan took place
between Smith and Stevenson, not between Smith and the lender,
and that after being told that he did not need to sign any
documents at the closing, rather than communicate his opposition
to the lender in his capacity as a joint owner of the property,
Smith left the closing. Even if Smith subjectively opposed the
Fremont Refinance, he has failed to produce or point to evidence
sufficient to support a finding that he communicated this
opposition to the lender in a manner that would rebut the
presumption that the lender reasonably expected to take a lien of
equal priority to the mortgage being paid.

For all of these reasons, the court concludes that Fremont's
actual knowledge of Smith's interest does not present a bar to
equitable subrogation and Fremont did not act as a volunteer when
it satisfied the Wells Fargo lien yet neglected to take a
security interest in Smith's interest in the property. The court
finds that, assuming the Fremont lien is valid, Fremont and its

successors in interest are entitled to equitable subrogation to
Wells Fargo's prior lien position to the extent of $118,334.02.[22]
Furthermore, it is equitable to subrogate Fremont's lien position
to include interest on the $118,334.02 to run from the date of
the Fremont transaction at the lesser of the interest rate
provided for in the Wells Fargo promissory note and the interest
rate provided for in the Fremont promissory note.

> 3.   <u>Bankers Trust Co. v. Hardy</u> is not
> consistent with the law of this jurisdiction.

In their supplemental post-hearing brief, the defendants
urge this court to follow the reasoning of <u>Bankers Trust Company
v. Hardy</u>, 640 S.E.2d 18 (Ga. 2007), a case decided under Georgia
law and involving similar facts to the case at bar.
Notwithstanding the similarities, <u>Bankers Trust</u> remains factually
distinguishable from the case at bar and does not accurately
reflect how the doctrine of equitable subrogation is applied in
District of Columbia courts.

In <u>Bankers Trust</u>, upon the death of her husband, Rita Hardy
and her minor son inherited real property subject to the lien of
First Union National Bank.  In an effort to avoid foreclosure,
Rita Hardy refinanced the First Union loan through Express
Funding.  The Express Funding loan, which was used to satisfy
First Union's lien, failed to mention the minor son's interest in

---

[22] This represents the sum of $118,129.03, the amount of the
Fremont loan paid to discharge the Wells Fargo obligation, and
$204.99, the amount applied towards property taxes.

the property.  As a result, Express Funding's security interest
encumbered only Rita Hardy's interest in the property.  Express
Funding's assignee, Bankers Trust, eventually foreclosed on the
property.  In addition to recovering the sale proceeds
attributable to Rita Hardy's encumbered interest in the property,
Bankers Trust invoked the doctrine of equitable subrogation and
sought to recover the sale proceeds attributable to the minor
son's interest.  Ruling in favor of the minor son, the <u>Bankers
Trust</u> court articulated three bases for denying equitable
subrogation.

First, the court concluded that Bankers Trust was
"chargeable with culpable or inexcusable neglect, because it
should have accounted for [the minor son's] interest in the
property.  Express Funding (and, by extension, Bankers Trust) had
every opportunity to protect its interests by including [the
minor son] in the loan transaction through the consent of a legal
guardian, but negligently failed to do so." <u>Id.</u> at 20 (internal
quotations omitted).  The facts do not indicate whether Express
Funding or Bankers Trust had actual or constructive knowledge
that the minor son was a joint interest holder at the time of the
original transaction or at the time of the assignment.  Likewise,
the <u>Bankers Trust</u> court's limited analysis makes it impossible to
determine whether any circumstances existed that would be
sufficient to rebut the presumption that either lender expected
to enjoy a lien of equal priority to the mortgage that was paid

30

through the refinance.  Without more detail concerning the
circumstances surrounding the transactions at issue in <u>Bankers
Trust</u>, the holding does not assist this court in its analysis.

Second, the court concluded that the minor son's "superior
. . . equity would be prejudiced by application of the doctrine
. . . [because he] had no representation in the loan transaction
. . . ."  <u>Id.</u> at 20.  The court rested its conclusion that the
minor son would be prejudiced solely on the fact that the minor
son was not represented at the transaction.  The court does not
explain why the minor son's representation at the transaction is
the only factor relevant to the question of prejudice, and I can
only surmise that the <u>Bankers Trust</u> court gave special
consideration to the child's status as a minor in weighing the
overall equities at stake, a fact not present in the instant
case.  The court's analysis regarding prejudice is
distinguishable on that basis.  Moreover, it is inconsistent with
District of Columbia law, which rejects the notion that prejudice
arises from subrogating a refinancing lender to the rights of a
pre-existing lien.

Finally, the court concluded that Bankers Trust acted as a
mere volunteer because it failed to obtain the minor son's legal
consent to the transaction and "knowingly acquired a secured debt
for the property at issue even though the party to whom the loan
had been issued was only a joint tenant and the other joint
tenant had not been included in the loan transaction.  Bankers

31

Trust cannot use the doctrine of equitable subrogation to acquire [the minor son's] interest in the property as a remedy for its own mistake." Id. at 21.  As discussed above, District of Columbia courts have distanced themselves from the theory that refinancing lenders act as volunteers when paying off a senior lien and the Restatement has outright rejected this line of reasoning.  Thus, to the extent the Bankers Trust court denied subrogation based upon the theory that the lender's knowledge rendered it a volunteer, it is inconsistent with the doctrine of equitable subrogation as that doctrine is applied in the District of Columbia.

Accordingly, this court will not rely on Bankers Trust in disposing of the parties' cross-motions for summary judgment.

V

For all of these reasons, the court will grant summary judgment in favor of the defendants as to Count I of the complaint.  Consistent with the reasoning of this decision, the court will grant partial summary judgment in favor of the plaintiff as to count II of the complaint.  The court reserves for later adjudication the plaintiff's motion to strike and the unresolved defenses raised in the defendants' motion for summary judgment.

[Signed and dated above.]

Copies to: All counsel and parties of record; Office of United
States Trustee.